# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| In the Matter of the Detention of: | No.  50817-6-II |
| D.W., | UNPUBLISHED OPINION |
| Respondent. | |

SUTTON, J. — DW appeals the superior court's order involuntarily committing him for up to 180 days at Western State Hospital.  First, he argues that there was insufficient evidence that he was gravely disabled under former RCW 71.05.020(17)(b) (2016),[1] and thus, he should not have been involuntarily committed under RCW 71.05.320(4)(d).  Second, he argues that his procedural due process rights were violated because the superior court found that a less restrictive alternative (LRA) placement was in his best interests, but it did not require the State to set forth its recommendations for outpatient treatment services for an LRA placement.

We disagree and hold that there was sufficient evidence to support the superior court's determination that DW was gravely disabled under former RCW 71.05.020(17)(b), and thus, the superior court did not err in ordering DW involuntary committed for up to 180 days under RCW 71.05.320(4)(d).  We also hold that DW's procedural due process rights were not violated because

---

[1] Laws of 2016, ch. 155 § 1.

the State was not required to set forth its recommendations for outpatient treatment services for DW.

FACTS

DW is a 71-year-old man who lived in a house with his friend, Jorge Noguera. Noguera became concerned about DW's mental state when DW left the water running and cleaned his electric razor while it was still plugged in. Due to his concerns, Noguera called the police and DW voluntarily went with officers to Swedish Medical Center. DW was later admitted to Western State Hospital for inpatient involuntary treatment for a 90-day commitment. DW had not previously been hospitalized for mental health reasons.

On May 18, 2017, DW's treating physician, Dr. Shawn Noor, and psychiatrist, Dr. Debra Burnison, filed a petition alleging that DW remained gravely disabled under former RCW 71.05.020(17)(b), and requested that he be involuntarily committed for up to 180 additional days under RCW 71.05.320(4)(d). They also submitted a declaration in support of their petition that outlined their diagnoses and opinions regarding DW's inability to care for himself.

On May 25, a bench trial was held. Dr. Burnison testified at the trial that DW was diagnosed with bipolar disorder and alcohol abuse disorder. She explained that DW exhibited grandiosity, tangential speech, and flight of ideas, all of which are criteria for bipolar disorder. She further testified that DW had poor insight into his medical and mental health conditions. He saw no benefit to taking his prescribed medication, and Dr. Burnison believed that, based on her evaluations, he would not remain on his medication if he was released. She concluded that, due to his many disorders, DW would be unable to provide for his health and safety needs if he was

released from Western State Hospital. She came to this conclusion through her observations of DW, conversations with his treatment team, review of his records, and interview with DW.

Prior to admission to Western State Hospital, DW had been drinking excessively. Dr. Burnison opined that many of his cognitive defects were caused by his alcohol abuse. She determined that he would drink again if released, and his mental state would further decline. She further explained that DW's return to drinking would result in the return of dangerous community behaviors that resulted in his commitment to the hospital. Dr. Burnison recommended that DW remain at Western State Hospital until an appropriate LRA placement in the community was available.

At the close of the trial, the superior court found DW gravely disabled under former RCW 71.05.020(17)(b) and involuntarily committed him for up to 180 days under RCW 71.05.320(4)(d). In its written order, the superior court found that DW was gravely disabled "as a result of a mental disorder [that he] manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over actions, [and] is not receiving such care as is essential for health and safety." Clerks Papers (CP) at 20. The superior court entered specific findings of fact supporting its conclusion:

> [DW's] current mental status examination reveals: Medication rights given and wishes respected. Symptoms for bipolar disorder: does exhibit grandiosity (he is too handsome, is extraordinary—will leave WSH and start a band and become famous—offer to buy a Mercedes for another), tangential speech, flight of ideas, etc. (some of this has improved). Some delusions (said he owns WSH—had music contract with Chuck Berry's agent). Has very poor insight into current medical challenges (says that when he leaves here he will live independently, become famous, etc.). Here in WSH he is medication compliant and other care provided [sic] helps him. But if released there are significant concerns about being able to meet his needs. With LRA structure in place he should be fine in the community. If released today it is unlikely he would care for himself (was drinking excessively

3

before being admitted)—had overriding issues of alcoholism. Deficiencies would place him at risk of harm in the community (previously drove without license, flooded basement, etc.). . . . Needs his care assessment before can complete an LRA assessment for level of care/placement for him. . . . There is medical evidence that is suggestive of the impact of the alcohol affecting his cognitive functioning. He shows poor judgment when he goes into the rooms of others and takes belongings, attempts to put on multiple articles of clothing and has to be prompted to select only certain articles of clothing.

CP at 20.

The superior court entered an order committing DW for up to 180 days of involuntary inpatient treatment under the second definition of "gravely disabled" under former RCW 71.05.020(17)(b). The superior court also set a review hearing to review the status of DW's progress toward an LRA placement.

DW filed a motion for reconsideration. In it, he argued that he did not meet the criteria for commitment under the second definition of gravely disabled. The superior court denied the motion for reconsideration. DW appeals.

## ANALYSIS

### I. EVIDENCE THAT DW WAS GRAVELY DISABLED

#### A. LEGAL PRINCIPLES

DW argues that there was insufficient evidence that he was gravely disabled; thus, the superior court erred by ordering him involuntarily committed. We disagree.

Former RCW 71.05.020(17)(b) defines "gravely disabled" as "a condition in which a person, as a result of a mental disorder . . . manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety." "The State has the

burden of proving that a person is gravely disabled by clear, cogent and convincing evidence." *In re Det. of R.H.*, 178 Wn. App. 941, 945-46, 316 P.3d 535 (2014).

> Under former RCW 71.05.020(17)(b), the State
>
> must present recent, tangible evidence of failure or inability to provide for such essential human needs as food, clothing, shelter, and medical treatment which presents a high probability of serious physical harm within the near future unless adequate treatment is afforded. Furthermore, the failure or inability to provide for these essential needs must be shown to arise as a result of mental disorder and not because of other factors.

*In re Det. of LaBelle*, 107 Wn.2d 196, 204-05, 728 P.2d 138 (1986).[2] Thus, to order DW's commitment, the superior court must find: (1) a recent proof of loss of cognitive or volitional control by DW due to his mental disorder, (2) that DW was unable to make a rational choice about treatment due to his lack of insight into his condition, and (3) a factual basis for concluding that he would not receive essential care if he were released. *See LaBelle*, 107 Wn.2d at 204-05. On appeal, we "will not disturb the trial court's findings of 'grave disability' if [they are] supported by substantial evidence which the lower court could reasonably have found to be clear, cogent and convincing." *LaBelle*, 107 Wn.2d at 209.

When determining whether a person should be civilly committed, evidence of past hospitalizations and deterioration in the community "may be used to provide a factual basis for concluding that the individual would not receive, if released, such care as is essential for his or her health or safety." RCW 71.05.285.

B. PRIOR HOSPITALIZATION

---

[2] In *LaBelle*, our Supreme Court addressed former RCW 71.05.020(1) (1979), which the legislature recodified as former RCW 71.05.020(17)(b) without substantive changes.

DW argues that there was insufficient evidence to find that he was gravely disabled because this hospitalization was his first hospitalization. We disagree.

Citing to RCW 71.05.012, DW claims that the State needs to prove a pattern of repeated hospitalizations or law enforcement intervention to establish that a person is gravely disabled under former RCW 71.050.020(17)(b). RCW 71.05.012, the legislative intent portion of the chapter, states,

> For persons with a prior history or pattern of repeated hospitalizations or law enforcement interventions due to decompensation, the consideration of prior mental history is particularly relevant in determining whether the person would receive, if released, such care as is essential for his or her health or safety.
>
> Therefore, the legislature finds that for persons who are currently under a commitment order, a prior history of decompensation leading to repeated hospitalizations or law enforcement interventions should be given great weight in determining whether a new less restrictive alternative commitment should be ordered.

Preliminarily, a "statement of legislative intent, used by the Legislature as a preface to an enactment, lacks operative force in itself, although it may serve as an important guide in understanding the intended effect of operative sections." *State v. Alvarez*, 74 Wn. App. 250, 258, 872 P.2d 1123 (1994). Thus, because this section is not operative, it is not substantive law, and it should not be read to require that a person needs to have been previously hospitalized prior to the State seeking an order for involuntary commitment under a finding that the person is gravely disabled.

When determining whether a person meets the criteria for civil commitment, evidence of prior hospitalizations and deterioration in the community "*may* be used to provide a factual basis for concluding that the individual would not receive, if released, such care as is essential for his or

her health or safety." RCW 71.05.285 (emphasis added). When that evidence is present, it is to be given "great weight." RCW 71.05.285. However, neither the statute nor the relevant case law requires a prior hospitalization as an element for finding a person to be gravely disabled.

Rather, our Supreme Court in *LaBelle* determined that the main questions for a court are (1) whether the person is showing severe deterioration of routine functioning, evidenced by recent proof of loss of cognitive or volitional control, and (2) whether they would receive the care they need to maintain their health and safety if released. *See LaBelle*, 107 Wn.2d at 208. *LaBelle* noted that the evidence must show that the person is unable to make a rational choice about his or her need for treatment, creating a "causal nexus" between the person's severe deterioration in routine functioning and evidence that he would not receive essential care if he were released. *LaBelle*, 107 Wn.2d at 208. Thus, we determine that DW's argument, that he needs to have been previously hospitalized prior to finding that he is gravely disabled, fails.

## C. FACTUAL BASIS FOR COMMITMENT

DW next argues that there was not a sufficient factual basis for the superior court to find that involuntary commitment was essential to his health and safety. We disagree.

Dr. Burnison testified about DW's recent decline in cognitive functioning due to his mental disorder, and that DW's "ability to live independently has changed dramatically over the past year." CP at 51-52. Dr. Burnison explained that DW had poor insight into his conditions, and did not believe that he had a mental illness. There was a sufficient factual basis for the superior court to conclude that DW would not receive essential care if released based on Dr. Burnison's testimony that DW would not care for himself. Thus, the superior court found (1) a recent proof of loss of cognitive or volitional control by DW due to his mental disorder, (2) that DW was unable to make

a rational choice about treatment due to his lack of insight into his condition, and (3) a factual basis for concluding that he would not receive essential care if he were released.

Therefore, we hold that substantial evidence supports the superior court's findings that DW was gravely disabled under former RCW 71.05.020(17)(b) because he was unable to provide for his health and safety needs as a result of his mental disorder, which put him in danger of serious physical harm.

## II.  OUTPATIENT TREATMENT SERVICES—LRA PLACEMENT

DW also argues that the superior court violated his procedural due process rights.  He argues that the superior court found that an LRA placement was in his best interest, but did not require the State to set forth its recommendations for LRA treatment services under RCW 71.05.320(4)(e) and instead it ordered him involuntarily committed for up to 180 days for intensive inpatient treatment.  We disagree with DW and hold that his procedural due process rights were not violated.

A person in Washington state who is involuntarily committed under RCW 71.05.320(4)(d) does not have a constitutional or a statutory right to LRA placement and treatment.  *In re Det. of J.S.*, 124 Wn.2d 689, 701, 880 P.2d 976 (1994).  "[T]o construe the statute to mandate less restrictive treatment options regardless of their existence or availability would be a strained interpretation, which is to be avoided."  *In re Det. of J.S.*, 124 Wn.2d at 701.

RCW 71.05.320(4)(e) applies to persons "in need of assisted outpatient mental health treatment."  RCW 71.05.585(1) applies to persons in need of LRA treatment services as ordered by the superior court.  Here, the State did not seek an LRA placement for outpatient treatment services for DW and the superior court did not order an LRA placement.  Thus, neither RCW

71.05.320(4)(e) nor RCW 71.05.585(1) apply. Instead, the State's petition alleged that DW was gravely disabled, that he required involuntary commitment up to 180 days for intensive inpatient treatment, and that he was "ready for a less restrictive alternative placement when an appropriate one is available." CP at 16. The superior court agreed that an LRA placement was in DW's best interest and ruled that later assessments were needed to determine the level of care required by DW for a potential LRA placement. Thus, the State was not required to submit its recommendations for an LRA placement for DW at that time. In accordance with *J.S.*, DW does not have a constitutional or a statutory right to an LRA placement. Therefore, , we hold that DW's procedural due process rights were not violated and the superior court did not err by not requiring the State to submit its recommendations for outpatient treatment services for DW. We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

SUTTON, J.

We concur:

MAXA, C.J.

JOHANSON, J.

9